[Sac. No. 641.  Department Two.—July 9, 1900.]

ALBERT H. STARR, Respondent, v. L. KREUZBERGER et al., Appellants.

129  123
135  439

MASTER AND SERVANT—LIABILITY OF MASTER FOR DEFECTIVE APPLIANCES.— A master is liable to the servant for injury caused from defective or unsafe appliances, the defects and danger from which were unknown to the servant, and were not obvious to his view.

ID.—MEANS OF KNOWLEDGE—DUTY OF MASTER—RIGHTS OF SERVANT.— The mere fact that the master and servant may have had equal means of knowledge will not save the master from liability. The master is bound to use the means of knowledge, and has no right to assume that the servant will discover defects in appliances rendering them unsafe. The servant has no such duty, but has a right to rely upon the master's means of knowledge, and duty of inquiry. He is not required to use any degree of care or diligence to discover defects or danger not obvious, and in regard to which he is not put upon inquiry by any discovery or suggestion of danger which it would be gross carelessness for him to neglect.

ID.—UNSAFE BRICK WALL—INJURY TO SERVANT—OBEDIENCE TO ORDERS— DANGER NOT OBVIOUS.—Where an injury resulted to the plaintiff from the falling of an unsafe brick wall in front of which he was employed as a bricklayer in building a front wall under employers, one of whom directed the work, and the obeying of whose instructions caused the falling forward of the rear wall, which was not an obvious danger to the plaintiff of his obedience to orders, it was the duty of the employers to know the condition of the wall, and the plaintiff was justified in obeying

the orders given, and the employers are responsible for the resulting injury.

ID.—CONSISTENCY OF FINDINGS—IGNORANCE OF UNSAFE CONDITION—COMPARATIVE OPPORTUNITY OF KNOWLEDGE. — Findings that the plaintiff was ignorant of the unsafe condition of the wall, and that he did not have a better opportunity than the defendant for seeing and knowing its condition, are not contradictory.

APPEAL from a judgment of the Superior Court of Sacramento County. J. E. Prewett, Judge presiding.

The facts are stated in the opinion.

Holl & Dunn, for Appellants.

A. L. Shinn, A. P. Catlin, and Henry Starr, for Respondent.

CHIPMAN, C.—Action by an employee against his employers to recover damages for personal injury claimed to have been sustained through their negligence. The defendants claimed that the injury was the result of plaintiff's carelessness. The cause was tried by the court and plaintiff had judgment. Defendants moved for a new trial, and the appeal is from the order denying the motion. Some objections are made to the findings as contradictory and argumentative, but the principal question argued is that the findings are not supported by the evidence.

The injury resulted from the falling of a brick wall on which plaintiff was working as a bricklayer. The findings challenged were: "Finding III. That said brick wall was in an unsafe condition for the work for which plaintiff was employed and directed to perform, and which defendants knew, but of which plaintiff was ignorant. That while working, and through and by the negligence of the defendants in employing plaintiff upon said work and directing him in the manner of performing the same, and without fault or negligence on the part of the plaintiff, the said wall fell upon and injured plaintiff," etc. "Finding IV. That plaintiff did not have a better opportunity than the defendants of seeing and knowing the condition of said wall. That plaintiff was not guilty of carelessness or negligence in working upon said wall."

Plaintiff was a journeyman bricklayer of thirty years' experience. Defendants were partners and contractors for the work

being done, Kreuzberger being an experienced bricklayer and contractor, and Harvie a carpenter and contractor. The work was being done on a small brick building, part of the premises of the City Brewery in Sacramento, attached to the east side of the main brewery building. It was a one-story brick structure, with a brick gable front. The improvement consisted in raising the building an additional story and adding to the thickness of the wall by building a new four-inch wall of pressed brick from the ground, upon and against the entire front. The roof was first detached from the walls of the building and raised to the required height and supported there free from the walls. The new wall was to be tied or fastened to the old wall by cutting out two courses of brick across the front every two feet and inserting therein what were called "headers," or courses of brick, crosswise of the main wall, so as to connect the main with the new wall, and thus tie them together. These grooves were cut continuously across both buildings, as both were undergoing similar changes. We have to deal, however, with the smaller building and shall refer only to it. The walls of this building were originally twelve or fourteen inches thick from the ground up to the bottom of the ceiling joists, a distance twelve or fourteen feet. From this point a fire-wall extended upward "several feet above the bottom of the ceiling joists," and was eight or nine inches thick, resting on the twelve-inch wall. Upon this fire-wall was the front gable-end, of the same thickness as the fire-wall. Successive grooves were cut, and no question is made that this could be done safely in the thirteen-inch wall, but the last groove was cut about two inches below where the eight-inch fire-wall rested on the thirteen-inch wall, which undermined the fire-wall or gable-end, and it fell upon and injured plaintiff while he was at work. Appellants say in their brief: "It is not denied that cutting this last groove, four and one-half inches deep into the thirteen-inch wall, two inches below the point where the nine-inch wall commenced, caused the nine-inch gable-wall to fall; and the whole question is whether the plaintiff is free from negligence in cutting this groove."

It is conceded by both parties that there was no danger in cutting the grooves in the thirteen-inch wall, and all of them had been cut by direction of Kreuzberger as continuous grooves,

i. e., from end to end, without leaving any sections of the bricks in the grooves. There is evidence that where there is danger from the upper portion of the wall giving way when undermined in this manner, the proper and safe course to pursue is to leave portions of the wall, at intervals, undisturbed, but in the thirteen-inch wall this, it is conceded, was not necessary, and no such precaution was taken. There were six workmen on the job and all were on the scaffold at the time the last groove was reached, and they had begun work on it when defendant Kreuzberger appeared.

Plaintiff testified that he was employed by defendant Kreuzberger and was working under his direction, as it appears were the other workmen also; at the time of the accident they were working on a scaffold nine or ten feet high, and they had carried up the four-inch wall about twelve feet; plaintiff was working at the east end of this wall or corner of the building, and on his left were the other workmen at intervals along the scaffold; the top of the brick wall at the corner was so high above the scaffold that plaintiff could not reach to the top. He testified: "I am not certain how high that thirteen-inch wall extended up. There was a fire-wall on the building. I did not know at that time how high the fire-wall was. There was nothing on the front of the building, where I was working, to indicate where the fire-wall commenced. Standing upon that platform where I was at work I could look up and see that the fire-wall was an eight-inch wall at the top. . . . . At the time we were cutting the slot, just before the wall fell, we had built up the four-inch wall to where the course of stone was put on, and that would stop our work until the stone masons had completed theirs. Mr. Kreuzberger came to me and said that he did not see how we were going to continue the work there; that the stone masons were in the way. But he says, 'You can cut a slot through there for the next header, and then you and Corsaw go up to the Buffalo Brewery.' I said, 'Where will I cut?' He turned to the wall and said, 'Well, about here,' putting his finger on the wall. I looked up and said, 'Aren't we getting pretty high?' And he said, 'No, that's all right.' Then Corsaw, standing inside of me, said: 'Well, what's the matter with cutting under the header?' That would bring it two courses still lower

than he first indicated. He said, 'All right, let it go at that, and have them all cut on the same line.' He left then and went toward Mr. Day's corner. . . . . He came back and finally said, . . . . 'Just cut that slot through, and you and Corsaw come up there, and the other boys will have to knock off.' He turned then and left again. We went to work and cut where he told us—that is, under the header." He then describes how the work proceeded, and how as the last brick was knocked out of the groove the wall fell over on them.

Plaintiff was given a very searching cross-examination as to what he meant when he said to Kreuzberger, "Aren't we getting pretty high?" the purpose being to show that plaintiff was fully warned of the danger and knew as well as his employer did the exact conditions under which he was working. He testified: "The reason I asked him that question was to be sure that we were not cutting too high in that twelve-inch wall, so as not to cut into the eight-inch wall and through that wall. In other words, I wanted to be sure that we were not cutting too high. Q. In other words, you suspected you might be up where you might be cutting into the eight-inch wall? A. No, sir; if I had had the least suspicion of it I would not have cut there." Plaintiff was further pressed upon this point, and testified: "Q. Now, if you wanted to be certain, you had not been certain before that, had you? There was a doubt in your mind? A. Well, we had not cut there. No, there was not a doubt after he had given me the order. . . . . I asked the question to be certain, and that is about the only way I can explain that. I asked that question in order to be certain that we were all right."

Further cross-examination developed the fact that plaintiff had, two years before, worked on the building and helped to lay the gable wall. "From the fact, then, of seeing the wall, and from having constructed that wall, you knew exactly how it was constructed? A. At the time it was constructed, yes. Q. Knew as much about it as Mr. Kreuzberger did? A. No, sir; I don't think so. Because he was the boss there and looked after the work. He would look at it more particularly than I would."

He was asked what information Kreuzberger had that he, plaintiff, did not have, and answered: "Why, he was the contractor there. He had been up there and figured. He must have been up there and figured on the work that he was going to do." Witness Day, one of the bricklayers on the job, testified: "It could not be seen from the outside, where we were at work on the platform, where the eight-inch wall commenced. Mr. Kreuzberger came along the platform and pointed out the place to cut the groove. He indicated the course of bricks to be removed, and we cut out the course which he indicated. After the wall fell I examined it, and found that the wall broke off within one or two courses of brick from the point where the eight-inch wall joined the twelve-inch wall." Hansen and Lynch, two other bricklayers who assisted in the work, testified that the groove was cut where Kreuzberger directed, and that they could not tell from the platform where the eight-inch wall joined the twelve-inch wall. Corsaw, who worked next to plaintiff, testified that they could not tell from the scaffold where the eight-inch wall commenced. "We would have to get a ladder and get up on top of the wall and measure the wall on the inside from the top down to the thirteen-inch wall where the eight-inch wall commenced, to ascertain that fact."

The architect, Mayo, testified: "A day or two before the gable end or fire-wall fell I told Lucas Kreuzberger [defendant] that that wall must be taken down. He knew that it had to come down, for the contract and specifications required that eight-inch wall to be taken down." Jackson, a laborer on the work, testified that Kreuzberger was on the top of the wall several times; that he, witness, had been ordered by the architect to take the gable wall down; "I was about to commence upon it when Mr. Kreuzberger came along and ordered me not to do it. I asked Mr. Kreuzberger who was boss of this work, and he said he was, but he must humor Mayo a little. He said he would save money by not taking the wall down." There is nothing in the evidence to warrant the inference that the architect ordered the wall taken down because of any fear that it might fall; the significance of this evidence lies in its tendency to prove that Kreuzberger knew all about the wall, and in tending to give rise to a further inference that in his endeavor to

avoid taking the wall down he was not as mindful of his servants' safety as it was his duty to be as a master, or as he otherwise would have been. The evidence is given with considerable fullness because of defendants' very earnest contention that the court drew erroneous deductions from it, and because it is seriously contended that under well-settled rules of law the evidence shows that plaintiff contributed to his injury by his own negligence and should not recover.

Appellants cite numerous cases, from which they deduce the following: "The doctrine established by these cases is that an employee engaged upon work that is dangerous, or using defective appliances or machinery, or working upon dangerous or insecure scaffolding, cannot recover damages for any injuries received through such defects, provided he knew, or had the means of knowing, the dangerous condition of such machinery or appliances; nor can he recover if his means of discovery of the defects and dangerous condition is as good as that of his employer." In the case of *Silveira v. Iversen*, 128 Cal. 187, reference was made to *Magee v. North Pac. Coast R. R.*, 78 Cal. 437,[1] where the rule relied upon by appellants that the servant cannot recover if his knowledge is as good as that of his master was held to be erroneous. In that case it was said: "The master has no right to assume the servant will use such means of knowledge, because it is not part of the duty of the servant to inquire into the sufficiency of these things. The servant has a right to rely upon the master's inquiry, because it is the master's duty so to inquire, and the servant may justly assume that all these things are fit and suitable for the use which he is directed to make of them." Mr. Justice Temple in the Silveira case said: "The employee is not required to use any degree of care or diligence to discover defects. He will be held to have assumed the risk only when he knew, and will be held to have known when the defect was so obvious that he must have known or simply refused to open his eyes and see, or when he was put upon inquiry by some discovery or suggestion of danger which it was gross carelessness for him to neglect."

It is strongly urged that because plaintiff helped to construct this wall two years before he must be held to have known all

---

[1] 12 Am. St. Rep. 69.

about it. But he testified that he did not know where the eight-inch wall joined the thirteen-inch wall, and this is the vital fact in the case. We must assume that defendants knew this fact, and, if they did not know it, the duty was cast upon them to know it, and plaintiff had a right to assume that they did know it. The evidence is that this fact could not be discovered from any point where the men were working, and that to have ascertained the place of junction of the main wall and the fire or gable wall would have required the laborers to make an investigation apart from their duties, and which it was defendants' duty to make, and which plaintiff had a right to assume that defendants, as contractors, had made. When plaintiff remarked to Kreuzberger, "Aren't we getting pretty high?" he, no doubt, had in his mind that they were near the eight-inch wall, and perhaps too near to make it entirely safe to cut the groove where Kreuzberger indicated. But when he was assured by his employer that it was all right to go ahead where he pointed out, I think plaintiff was exonerated from making any independent investigation, and was justified in assuming that there was no danger and that his employer knew more about the condition of the wall than he did. The danger was not obvious; it depended upon a fact which plaintiff did not know and which it was his employer's duty to know, and we think plaintiff was justified in going forward in obedience to the directions given him. (See 1 Bailey on Personal Injuries, secs. 898 et seq., where the question is discussed and the cases pro and con are collected.)

We do not think the findings are amenable to the objection that they are contradictory and argumentative. The alleged argumentative feature is in respect of allegations found in the answer which the finding negatives. One finding states that plaintiff was ignorant of the unsafe condition of the wall; and another finding states that he did not have a better opportunity than defendants for seeing and knowing its condition. Defendants' point is that because the finding was that plaintiff had no better opportunity, it in effect found that he had "as good an opportunity as defendants of seeing and knowing" the danger. We fail to see any necessary contradiction in the findings.

It is advised that the order be affirmed.

Gray, C., and Cooper, C., concurred.

For the reasons given in the foregoing opinion the order is affirmed.     McFarland, J., Temple, J., Henshaw, J.